In re Alfred Eugene CLEVELAND, Jr.,
t/a C. C. Tractor and Implement
Company, Bankrupt.

No. 359.

United States District Court
E. D. North Carolina,
Elizabeth City Division.

Dec. 6, 1956.

766

Wilson & Wilson, Elizabeth City, N. C., for Massey-Harris-Ferguson, Inc.

GILLIAM, District Judge.

This opinion is entered upon review of three final orders from this Court's Referee in Bankruptcy, made at the final meeting of creditors of the voluntary bankrupt, Alfred Eugene Cleveland, Jr., who did business as C. C. Tractor and Implement Company. A petition for such review was duly filed by the Massey-Harris-Ferguson Company, a participating creditor.

The first order objected to is that "Claim for $12,520.16 secured by two duly recorded deeds of trust on real estate. Creditor was allowed to foreclose and paid itself therefrom the total of $8,362.-93 against this claim. The balance of creditor's claim is now allowed in the sum of $4,157.23 as an unsecured claim." Massey-Harris-Ferguson (hereafter called Massey) bases its objection on the following circumstances.

Massey's claim for $12,520.16 had been allowed. The deeds of trust were held to be valid. Each deed included a provision for payment of taxes by the debtor on the property conveyed in the deed and further provided that in the event that such taxes were not paid as agreed, the creditor might pay them and the amount so paid would become due with the next interest installment. On October 7, 1955, the Referee in Bankruptcy signed an order permitting the Substitute Trustee of the two deeds to proceed with foreclosure. The order further directed that: "The proceeds derived from such sale or sales shall, if sufficient, be applied by the trustee or trustees selling under said deeds of trust to the payment, in the order of priority of liens, of taxes, premiums paid for insurance on the premises, amounts paid for the preservations thereof, cost and expenses of sale, the amounts due on the notes secured by said two deeds of trust with interest accumulations, and such other amounts as it may be necessary to pay in order to convey to the purchaser a good title free of liens."

On December 5, 1955, the Substitute Trustee sold the land under Massey's deeds of trust. Massey bought in the property at the sale and paid itself $8,-362.93 after paying $948.82 to the County of Hertford and the City of Murfreesboro for delinquent taxes with interest. Massey now contends that for the $948.-82 taxes and interest it paid, it should have been allowed the priority status of the taxing authorities in the distribution of the general assets, rather than being relegated to the status of an unsecured creditor for the full $4,157.23 remainder of its claim.

The first question raised by this contention is whether one, not a mere volunteer, who pays the tax liability of a bankrupt estate, can be subrogee of the taxing authority in the distribution of the estate. There is a substantial division of the authorities on this question which is amply discussed in In re Rogers, D.C.Cal.1951, 101 F.Supp. 555. Exemplary of the decisions holding that there can be no subrogation is In re Minogue, D.C.N.Y.1930, 39 F.2d 239.

A leading decision in the Fourth Circuit holds that subrogation may be properly allowed. The following language is quoted from In re Baltimore Pearl Hominy Co., 4 Cir., 1925, 5 F.2d 553 at page 556: "There is a labyrinth of decisions on the subject of subrogation. We shall not undertake to go through it. Our conclusion is that the government had a lien for the taxes, and when the banks and trust companies, unsecured creditors, paid it, they were entitled by subrogation to the same preference in the distribution of the assets of the bankrupt that the government would have had but for the payment. One who pays taxes

may in a proper case be subrogated to the rights of the government in the distribution of the assets of a bankrupt estate. Dayton v. Stanard, 241 U.S. 588, 36 S.Ct. 695, 60 L.Ed. 1190."

Is this a "proper case" for subrogation? If it is, what are the rights of the county and city governments in the distribution of the assets of this bankrupt estate? First it must be noted that Massey was not an unsecured creditor that protected assets for the benefit of the general creditors. Instead it was a lien holder that realized on its security, from the sale of which no increment resulted to the general assets. Massey's payment of the property taxes improved the situation of the general creditors only in so far as it denied the taxing bodies a priority share in the general assets.

Section 57, sub. n of the Chandler Act, Title 11 U.S.C.A. § 93, sub. n states the following rule. "Except as otherwise provided in this title, all claims provable under this title, including all claims of the United States and of any State or subdivision thereof, shall be proved and filed in the manner provided in this section. Claims which are not filed within six months after the first date set for the first meeting of creditors shall not be allowed: * * *."

Section 64 of the Chandler Act, Title 11 U.S.C.A. § 104, sub. a, provides: "The Court shall order the trustee to pay all taxes legally due and owing by the bankrupt to the United States, State, county, district, or municipality, in the order of priority as set forth in paragraph (b) hereof: * * * (b) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be * * * (6) taxes payable under paragraph (a) hereof * * *."

The case of De Laney v. City and County of Denver, 10 Cir., 1950, 185 F.2d 246, 249, sets out the relationship of these two sections of the Chandler Act.

"Prior to the enactment of § 57, sub. n of the Chandler Act, claims for taxes did not need to be proved and filed, but were governed by § 64, sub. a, 11 U.S.C.A. § 104, sub. a, which required the trustee to pay all taxes legally due and owing without distinction between the state and federal government. However, the bankruptcy court could issue a bar order requiring a state or the United States to file its tax claims within a certain period or be barred from participating in the estate. By § 57, sub. n of the Chandler Act, tax claims were removed from their former favored position and tax claims, as distinguished from tax liens, must now be proved and filed in the manner provided in § 57 of the Chandler Act."

Then after setting out Sec. 64 which is quoted above, the Court continued:

"But, priority under that section [Sec. 64] does not refer to liens existing on the bankrupt's property, nor to the order of payment of such liens, but to the order of payment of debts out of the general assets of the estate after the satisfaction of valid liens. Claims for taxes secured by valid liens, like other valid liens, must be satisfied out of bankrupt's estate before any distribution begins under § 64, supra, subject however to the provisions of § 67, sub. c of the Chandler Act, which provides for postponement in payment of certain tax liens to the debts specified in clauses (1) and (2) of subdivision a of § 64, supra. * *

"A lien claimant may pursue one of three courses: (1) he may prove his claim as an unsecured claim and surrender his security; (2) he may prove his claim as a secured claim, give credit thereon for the value of the security, and share in the general assets as to the unsecured balance; or, (3) he may not file a claim at all and rely solely upon his lien.

"The proof in bankruptcy of a claim as secured implies that the creditor desires primarily to avail himself of his security and to share in the general assets on the basis of the unsecured balance. Only on account of and with respect to his share in the general assets as to the unsecured balance, is it necessary to file a proof of claim.

"If the lien claimant elects either optional course (1) or (2), he must file and

prove his claim in accordance with the provisions of § 57 of the Chandler Act. If he elects optional course (3), he need not file a formal claim. The filing of a formal claim in bankruptcy is not essential to the preservation of a lien."

The county and city had an iron-clad lien on the realty for which taxes were overdue, North Carolina General Statutes 105–340 and 376. It could have been enforced against the property in the hands of Massey, the purchaser, at the foreclosure sale. However, only a part of the tax liability discharged by Massey was collectable from the general assets of the bankrupt's estate. This part was $294.81 plus interest, representing city taxes for 1954. A claim for that amount had been made by the city. No claims were made for the other taxes that Massey paid.

In the light of the foregoing, it is readily seen that, except for the $294.81 plus interest that the City of Murfreesboro made a claim for, the county and city chose to rely solely on their statutory liens. Massey or the Substitute Trustee of the deeds removed the liens by paying the delinquent taxes. However, except for the $294.81 with interest, there is no priority claim against the general assets to which Massey can be a subrogee. The Referee erred by not allowing Massey a priority payment of this amount that the taxing authority had claimed.

Massey's two remaining objections relate to the Referee's refusal to recognize two of its claims as secured. The first, a claim for $8,467.97, was purportedly secured by a "Sales and Service Agreement", unregistered before bankruptcy. The relevant provisions of that agreement are as follows.

"The title for all goods shipped under this agreement is to remain in the Company (Massey-Harris-Ferguson) and all goods will be held by the Dealer (the bankrupt), at all times, subject to the Company's order until the purchase price is fully paid in United States money. If any goods are disposed of through retail sales, the proceeds of such Inventory changes, whether cash, book accounts, notes or other proceeds, becomes the property of the Company and will be held by the Dealer, subject to the order of the Company, until all indebtedness arising under this agreement is fully paid in money.

"At the Company's request the Dealer will provide the Company's representatives with an accurate and full accounting for all goods on hand or goods sold and the proceeds thereof. Nothing herein shall release the Dealer from payment of all goods to the Company and said goods shall be held at the Dealer's risk and expense with respect to taxes and all other charges of every description and for losses or damage from any cause whatsoever."

The second claim on which security was denied by the Referee was for $3,-720.63, represented by a demand note accompanied by a chattel mortgage. The mortgage was duly registered August 12, 1954. It purported to cover "The entire Massey-Harris Tractor & Machine Repair Parts Inventory together with fixtures for said parts."

Massey's petition relates that: "At a general auction sale of personal property in bankruptcy on May 23, 1955, this creditor appeared and objected to the sale of so much thereof as are described in said Chattel Mortgage. But over the objection and protest of this creditor the Trustee sold, free and clear of the lien of said Chattel Mortgage, the said tractor and machine repair parts inventory to one Hal Riddick, the highest bidder, for the sum of $1,100.00 and to the same bidder the metal bins for $200.00, total $1,300.00. In connection with this claimant's objection to the sale thereof, this claimant demanded of the Trustee that if its objection be denied then the amount to be received from such sale be segregated and impressed with the lien of said Chattel Mortgage. This protest and demand are recited in this claimant's Proof of Claim for $3,720.63."

Morris Plan Bank of Virginia v. Cook, 4 Cir., 1932, 55 F.2d 176, 178 is a case that arose in this district and is, in all

its essentials, on all fours with the situation presented by Massey's $3,720.63 claim and the Chattel Mortgage securing it. After stating the case, Judge Soper continued with the following opinion which is quoted in full:

"Section 67a of the Bankruptcy Act (11 U.S.C.A. § 107(a), provides that 'claims which for want of record or for other reasons would not have been valid liens as against the claims of the creditors of the bankrupt shall not be liens against his estate.' The question whether the deed of trust in this case is valid as against the creditors of the bankrupt must be determined by the law of North Carolina. Holt v. Crucible Steel Co., 224 U.S. 262, 32 S.Ct. 414, 56 L.Ed. 756; In re Sachs, 4 Cir., 30 F.2d 510. Section 1005 of the North Carolina Code (C.S.1919) is a substantial re-enactment of the Statute of 13 Eliz. c. 5, § 2, and provides in substance that every grant and conveyance of goods and chattels devised to delay, hinder, and delay creditors of their just and lawful actions and debts, shall be utterly void and of no effect. The validity of a mortgage upon a stock of goods, retained in possession by the mortgagor, with the right to sell in the course of business, was considered by the Supreme Court of North Carolina in Cheatham v. Hawkins, 76 N.C. 335, and 80 N.C. 161. The mortgage expressly reserved the right of possession to the mortgagor and by implication gave him the right to sell the mortgaged property. It was held that such a document was presumptively fraudulent, and that, when it was considered in connection with evidence showing that the mortgagor had other creditors, but no other property with which to satisfy their claims, the presumption of fraud became so strong that it could not be removed by the testimony of the parties that the intent to defraud was not in their minds when the mortgage was executed. At 76 N.C. 338, the court said:

" 'The power to sell was the power to destroy and the sale was the destruction and extinction of the property. If there were other unsecured creditors at the time of this assignment and no other property of the debtor than that conveyed in the mortgage, out of which creditors could make their debts, the fraudulent intent would seem to be irrebuttable. A clear benefit is secured to the debtor and a clear right is withheld from the creditor beyond what the law permits. An assignment cannot cover up and preserve the property for the debtor's use or protect it from the remedies and demands of the creditors. Here is not only a retention of possession by the assignor, which is presumptive evidence of fraud, but there is the further power to dispose of it for the debtor's benefit, and still more, the exercise of that power annihilates the thing itself. We have then one of the strongest cases of presumptive fraud. It is clear that if there is no proof to rebut the presumption there is nothing for the jury to pass upon and the presumption of fraud raised by the law becomes conclusive.'

"When the case was heard by the Supreme Court a second time (80 N.C. 161), it appeared that, upon the retrial of the case below, testimony to rebut the fraud had been given by the parties to the mortgage who swore that, in making and accepting the deed, they did not intend thereby to hinder, delay, or defraud other creditors of the mortgagor or to secure any benefit to him or his family. Commenting upon this evidence, the court said (page 163 of 80 N.C.):

" 'This cannot be allowed to remove the legal presumption arising from the facts. Acts fraudulent in view of the law because of their necessary tendency to delay or obstruct the creditor in pursuit of his legal remedy, do not cease to be such because the fraud as an independent fact was not then in mind. If a person does and intends to do that which from its consequences the law pronounces fraudulent, he is held to intend the fraud inseparable from the act. To leave a stock of goods after they have been conveyed by mortgage in the debtor's possession and subject to his exclusive control and disposition as if they were

his own while they are at the same time placed beyond the reach of execution, is itself a fraud; because it does secure ease and exemption to the debtor and obstructs the creditor's remedial process for the enforcement of his debt against the property.'

"In the later case of [A. Blanton] Grocery Company v. Taylor, 162 N.C. 307, 78 S.E. 276, it was held that a chattel mortgage on a stock of merchandise to secure a note could not be maintained against an assignment to secure creditors because it was provided in the mortgage that the mortgagor might sell the merchandise thereby conveyed without making provision for the application of the proceeds of sale. The charge of fraud was made by the assignee for the benefit of creditors. Commenting upon the facts of the case, the court said (page 310 of 162 N.C., 78 S.E. 276, 277):

" 'If we were dealing with any other class of property than a stock of goods, or if it was necessary in this case to prove a corrupt and fraudulent intent, we would hold there was no such evidence, as there is nothing in the evidence suggesting that the plaintiffs (mortgagees) had any unlawful or wrong purpose, but the character of the property and the admitted facts are such that there arose a presumption of a legal fraud, which the plaintiffs were required to rebut.'

"The court then cited the case of Cheatham v. Hawkins, supra, and, showing that it had been affirmed in a number of subsequent cases, said (page 311 of 162 N.C., 78 S.E. 276, 278):

" 'The principles to be deduced from these authorities are:

" '(1) That a mortgage upon a stock of goods, the possession of which is left with the mortgagor, to secure a debt, maturing in the future, which contains no provision for an account of sales and the application of the proceeds to the debt, is presumptively fraudulent as to existing creditors.

" '(2) That the motive or intent entering into the transaction is immaterial, and that the presumption of fraud cannot be rebutted by proving the absence of an actual intent to defraud.

" '(3) That the presumption of fraud may be rebutted by proving that there was no other creditor of the mortgagor at the time of the registration of the mortgage, or if there was such creditor that the mortgagor owned other property at that time, which could be subjected to payment of the debt, sufficient to pay such creditor.'

"It is clear that the mortgage in the pending case must be condemned by the application of these principles. Conceding that the mortgagee was influenced by the statement furnished by the mortgagor showing his solvency, and therefore had no actual intent to hinder, delay, or defraud his creditors, it is nevertheless true that the mortgagor was left in possession of the stock of goods with leave to sell them in the usual course of business. Other debts were outstanding at the time. Under these circumstances, it was incumbent upon the mortgagee, under the law of North Carolina, if it would safeguard its mortgage, either to have provided therein for an accounting of the sales and an application of the proceeds to the mortgage debt, or to make certain at its peril that the mortgagor owned other property sufficient to take care of his other creditors.

"The bank in the pending case attempts to avoid the effect of the state decisions by pointing out certain circumstances as tending to rebut the presumption of fraud. They are: (1) That the mortgagee was furnished with a financial statement by the mortgagor showing a large excess of assets over liabilities; (2) that the mortgagor was required to pay $500 monthly on account of the debt and this provision should be considered equivalent to an accounting of the proceeds of sale and an application thereof to the debt; and (3) that the proceeds of the sales were honestly used in paying the legitimate expenses of the business. It is earnestly contended that these circumstances should be held sufficient to rebut the presumption of fraud, in view

of the decision in Kreth v. Rogers, 101 N.C. 263, 7 S.E. 682, and that in Davis v. Turner, 120 F. 605, which came to this court from the Eastern District of North Carolina. These cases furnish some support to the argument, but they were rendered prior to [A. Blanton] Grocery Company v. Taylor, supra, and we are obliged to follow the later deliverance, since it reaffirmed the earlier case of Cheatham v. Hawkins, and involved facts more nearly resembling those in the case at bar. Under the prevailing rule, it is no answer to the charge of invalidity for the parties to say that they did not intend fraud when the paper was executed, or that the mortgagor has actually accounted to the bank for the merchandise sold. Such a mortgage as we have here is to be judged rather by what the mortgagor is permitted to do under its terms than by his actual performance. The storekeeper in this case was at liberty to do as he pleased with the proceeds of his sales, so long as he kept his word to pay $500 monthly to the mortgagee; and this arrangement was not equivalent to a definite promise to apply the proceeds of sale to a payment of the debt.

"The North Carolina law is no more stringent in its regulation of chattel mortgages than the rule generally maintained, for it is widely held that, when the mortgagor of a stock in trade is permitted by the mortgagee to remain in possession and to make sales therefrom in the ordinary course of business, applying the proceeds to his own use if he sees fit, the transaction is fraudulent and void as to creditors. It does not matter whether the permission is expressly set out in the mortgage or in some collateral agreement, oral or written. The deed is considered to be in practical effect a fraud upon the rights of creditors without regard to the actual intent of the parties thereto. See Robinson v. Elliott, 22 Wall. 513, 22 L.Ed. 758; 11 Corpus Juris, 573; In re Joseph, D.C., 43 F.2d 252."

■ From all that appears before me, Massey introduced no evidence, nor for that matter does it even contend, that there were no other creditors when it took the Chattel Mortgage in question, or that if there were, the mortgagor had ample assets to satisfy their claims in full. In the light of the foregoing opinion, this is what Massey would have had the burden of proving if it were to rebut the presumption of fraud. In the Chattel Mortgage relied on by Massey there is no mention of any accounting for the proceeds of the inventory that the mortgage purports to cover.

The Referee was correct in not recognizing any lien against the Bankrupt's inventory stemming from Massey's Chattel Mortgage. The Referee erred in failing to allow Massey's Chattel Mortgage to stand as a valid lien against the fixtures that it purported to cover. Applied to the fixtures, the mortgage is not subject to the limitations and objections against its application to the inventory. The metal bins comprising the fixtures in question were not held by the mortgagor for sale in the normal course of business. Accordingly, Massey's lien is entitled to recognition against the proceeds from the Trustee's sale of the fixtures, to wit $200.

■ Massey's contention that its $8,467.97 claim was secured by the sales and service agreement containing the title retention contract previously set out cannot be sustained. Since this agreement encompasses merchandise held for sale by the Bankrupt, it is subject to all of the objections which render the Chattel Mortgage ineffectual. In addition this contract was not registered in accord with North Carolina law. Such secret agreements, while probably valid as between the parties, cannot affect the rights of other creditors represented by the Trustee in Bankruptcy.

The Referee's orders are accordingly modified.